# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
# CHARLESTON DIVISION

**UNITED STATES OF AMERICA**

v.                                                    Criminal No. 2:24-cr-00129

**DONALD A. ENNIS**

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Donald A. Ennis, by counsel, Assistant Federal Public Defender Rachel E. Zimarowski, submits this memorandum for the Court's consideration at his upcoming sentencing hearing.

### I.    Legal Objection

Mr. Ennis and the government agree the cross reference in U.S.S.G. § 2B1.1(c)(2) does not apply because the arson is not relevant conduct for the offenses of conviction under § 1B1.3(a). *See* PSR Add.; Dkt. No. 31 at 2. Inasmuch as the arson was complete before Mr. Ennis conceived his fraudulent scheme, his total offense level should be 18.

### II.    18 U.S.C. § 3553(a) Factors for Consideration

With a criminal history category of I and a total offense level of 18, Mr. Ennis' advisory guideline range should be 27 to 33 months of incarceration. He respectfully suggests this range recommends a term of imprisonment that would be greater than necessary to achieve the statutory sentencing purposes of 18 U.S.C § 3553(a). Consequently, he asks the Court to consider a below-guidelines sentence of probation that will allow him to continue working and make payments towards his restitution

obligation. He recognizes the substantial weight of this request, and he relies upon the following § 3553(a) factors in support of a non-custodial sentence.

   **1. The nature and circumstances of the offense and the history and characteristics of the defendant.**

Mr. Ennis served as a paramedic with the Kanawha County Emergency Ambulance Authority ("KCEAA") for nearly two decades. In that capacity, he saved countless lives. He also saw unimaginable horrors.

First responders are a uniquely vulnerable population who experience mental illness at a rate far higher than the general population. Arjmand, H.-A. et al., *Mental Health Treatment for First Responders: An Assessment of Mental Health Provider Needs*, PSYCHOLOGICAL SERVICES, 21(3), 489–499 (2024).[1] They are "exposed to unique traumas such as pediatric death, motor vehicle accidents, and suicides" on a daily or near-daily basis—the kind of thing most people experience just once or twice in a lifetime if they're unlucky. *Id.* Moreover, unlike other high-trauma populations (e.g., the military), first responders "often work and can be traumatized in the same environments in which they live." *Id.* This continuous exposure to trauma aggregates over time and is compounded by an industry standard that demands "work[ing] for days at a time" with few breaks. *Id.* As a result, first responders experience high rates of "PTSD, major depressive disorder, [] anxiety disorders," "sleep problems," and "hazardous alcohol use." *Id.* In an occupational culture that encourages toughness

---

[1] *Available at* https://doi.org/10.1037/ser0000832 (last visited May 22, 2025).

and emotional detachment, these conditions often fester without treatment. *Id.* The suicide rate among first responders is "strikingly high[]." Miriam Heyman et al., *The Ruderman White Paper on Mental Health and Suicide of First Responders* 20 (April 2018).[2]

Mr. Ennis bears the mental scars of spending twenty years enmeshed with injury, violence, death, and destruction. He presents with the endemic diagnoses of his profession: post-traumatic stress disorder, major depressive disorder, generalized anxiety disorder, and alcohol abuse (early remission), all of which remained largely untreated until he began counseling in 2024. *See* Counselor Hartz Letter (submitted under separate cover). These conditions led Mr. Ennis to try and take his own life, not once but three times. PSR ¶ 72.[3] He also engaged in other self-soothing behavior, namely "mindless spending." PSR ¶ 17. Numbed by his depression and driven to impulsivity by his ADD, he allowed himself to disassociate from what he was doing: stealing. But the guilt weighed on him then, and it is almost unbearable today.

Mr. Ennis' crimes are terrible. But the rest of his life has been dedicated to helping others. With his own two hands, he has staunched bleeding, set bones, and literally brought members of this community back to life. The good he has done, his

---

[2] *Available at* https://dir.nv.gov/uploadedFiles/dirnvgov/content/WCS/TrainingDocs/First%20Responder%20White%20Paper_Final%20(2).pdf (last visited May 22, 2025).

[3] His first two attempts were telling—even with a gun in his hand, he was only worried about his family finding the aftermath. He had seen enough shell-shocked families in bloody living rooms to know that his own wouldn't recover.

willingness to run into danger, his complete and utter selflessness as a paramedic, father, son, uncle, and friend—it's no wonder so many of his loved ones have written letters expressing how difficult it is to reconcile that man with the one who committed these crimes. He feels the same way.

Mr. Ennis spent years studiously avoiding the growing knot in his stomach. Facing what he did, what he was doing, was too much to bear; it was easier to lean into his disordered thinking and tell himself that the credit card was his own, that the fire was an accident. He was relieved when he was caught, and he promptly confessed. If he hadn't cooperated—immediately, fully, and repeatedly—the arson may well have gone undetected. But Mr. Ennis' fever had broken, and he needed to talk. He hasn't stopped since. He told his family. He told his friends. He started seeing a therapist, where he learned skills to deal with his persistent sense of self-hatred and irrational thought patterns. When he lost the career that was his entire identity, he picked himself up and got another job instead of ruminating over suicide. He has come a long way. Now, his life's ambition is to repay what he took and undo, as best he can, the damage he caused.

**2. Need for the sentence to afford adequate deterrence to criminal conduct.**

As evidenced by the letters from his counselor and former employer, Mr. Ennis has displayed sincere regret for his past actions and formed a plan to treat the psychological issues that precipitated his criminal conduct. Moreover, it bears emphasis that even a sentence of probation is "a substantial restriction of freedom."

4

*Gall v. United States*, 552 U.S. 38, 48 (2007). Mr. Ennis' supervision conditions will include mental health treatment, monitoring of his finances, and the requirement he make a third-party risk notification to any employers. PSR ¶¶ 111-119. Given the lengthy period of time he has been violation-free while on bond in this case, it is clear he needs no further incentive to adhere to the law. As for others, given the unique nature of Mr. Ennis' position, his crimes are unlikely to be repeated; and even so, a lifetime of poverty in service of restitution payments is surely a greater deterrent than a period of minimum-security confinement.

> **3. Need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

After many years of suffering in silence, Mr. Ennis found a program of mental health treatment that is working for him. He has made a great deal of progress with his current counselor and medication regimen. A non-custodial sentence will permit him to continue with his current counselor and, most importantly, continue working—the most critical factor in maintaining his mental health. Mr. Ennis needs to remain useful and serve others to stay well, and he is best positioned to do so outside of prison walls.

Further, Mr. Ennis suffers from severe diabetes. He wears a continuous glucose monitor that he must change out every 10 days. The reality of the BOP's medical care can't be ignored; it is overtaxed, underfunded, and aimed at being just a step above deliberately indifferent. If Mr. Ennis' diabetes isn't adequately cared for,

5

he could end up permanently disfigured or worse. A non-custodial sentence will ensure that he receives effective medical care.

4. **Need to provide restitution to victim(s) of the offense.**

Mr. Ennis' ability to make restitution payments depends on him remaining employed. The shorter his custodial sentence, the more money he can put towards restitution. He has a job; if he goes to prison, he won't keep it. He asks for the opportunity to continue working so he can start down the long road of making his victims whole.

5. **Need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.**

Mr. Ennis recognizes his behavior warrants significant punishment. He asks the Court to consider that he is now a two-time felon and has permanently lost many of his civil rights. He has been publicly shamed and stripped of a job and career that were everything to him. He will be making restitution payments for decades. Every paycheck, every month, Mr. Ennis is going to remember and regret what he did. In the context of his long career of extraordinary public service and consequent mental health issues, a non-custodial sentence dedicated to employment, repayment, and rehabilitation is a just punishment for his offenses.

III. <u>Conclusion</u>

For the foregoing reasons, Mr. Ennis submits that a probationary sentence is sufficient, but not greater than necessary, to achieve the statutory sentencing purposes of 18 U.S.C § 3553(a).

### IV. Time Needed for Sentencing

Mr. Ennis does not anticipate calling any witnesses to testify at the upcoming sentencing hearing and believes the hearing will last approximately half an hour.

Date: May 22, 2025                                     Respectfully submitted,

**DONALD A. ENNIS**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/Rachel E. Zimarowski**
Rachel E. Zimarowski, WV Bar No. 11415
Office of the Federal Public Defender
300 Virginia Street, East, Room 3400
Charleston, WV 25301
Telephone: (304) 347-3350
Facsimile: (304) 347-3356
E-mail: rachel_zimarowski@fd.org